I'm going to ask only the appellant, counsel, for the appellant to step forward and then introduce yourself and we'll go over the ground rules. We're going to, because there's a cross appeal, you'll have a chance to respond to their cross appeal in your rebuttal and they'll have one chance to argue. Thank you. Joseph Power here for the appellant, Brenda Mockbee. I'm sure you're aware, Mr. Power, that's not an amplifier, that's simply a recording device, so you'll need to speak up if you can. I appreciate that. And your honors, is it 10 at 5? It is, but we don't really stick to that strictly, but you can reserve any portion. We may take up a good amount of your, a lot of time to begin with. And since you've already sort of started, one of the things, one of the hurdles, or one of the legal obstacles you might have to overcome first is that worker comp section that claims to extend immunity, or extend coverage under worker comp to the service organization, because if we were to find that that section applied in this case, that is, that Harris qualified as a service organization, then that would pretty much end the case. True? Well, that would be true, but first of all, Harris nor Humphrey are service organizations. Well, let's stick with Harris to begin with, but tell us why Harris doesn't qualify. Well, they do repairs, they do maintenance, they sell things. As you know from the only case cited, the Meyer case, that case is when you're dealing with a wholly owned subsidiary of Aon Insurance Company, which was the workers comp carriers, they also put in the service corporations. And we're talking about service corporations, and this is in derogation of common law, so it's to be strictly construed. And we wouldn't want to be talking about companies that come in and do service for customers, because you can imagine what that would mean. Well, I can imagine what it would be, and we can only go on the language that's in the comp statute itself, and it seems to me that it suggests that certain organizations, because they fill the shoes of the employer in certain contexts, should be treated as an employer is under the worker comp statute. And I thought that's the intent behind this amendment, and it's been there a long time. And quite honestly, I understand that there aren't very many cases, or maybe two or three cases that actually address this section, but really it would seem to me that it wouldn't come up very often. It would come up almost always. Whenever you're dealing with a corporation that would be hiring a company to come in and do an inspection, you can imagine in my building, they call in people to come in and inspect the furnace, to inspect electricity, to inspect you. You would be dealing with thousands and hundreds of thousands of cases where you'd have immunity if we were to apply this to anybody coming in and doing an inspection. I didn't mean that there aren't a lot of cases out there. I meant that there aren't a lot of cases that would negatively impact an injured party claiming that that liability falls on the service organization as opposed to the employer. No, well, there aren't a lot of cases because no one has ever construed this to mean someone coming in to doing an inspection in a building has immunity. The trial court didn't grant summary judgment on this ground. No, even the trial court didn't. In the workers' comp setting, this service provider that's envisioned under the statute, I would think, would be given this if they're contributing to the workers' compensation. Now, the employer is required and then the carrier, such as AON in that other case, but a service organization, I mean, I don't see what they should be contributing so that they should have the benefit of this statutory. But the question is why, let's say there's a question whether service organizations actually could make contributions in the way Justice McBride was referring to, why is that service organization term in the statute to begin with if it doesn't mean something? It means service organization. In the Meyer case, what it means is an organization that's only providing a service that's related to the comp carrier. So they're giving immunity to the comp carrier and they're also giving immunity to a service corporation, a corporation that's only providing a service that in this case would be related, as the Meyer case says, to the comp carrier. So they get a benefit of the bargain. But this is to be strictly construed because it's in derogation of common law. And it's strictly construing that Humphrey nor Harris are service organizations. They do maintenance. They do repairs. They sell things. Even the trial judge mentioned that just not on this point in the Humphrey order, talking about all the things that Humphrey does and Harris too. But just so it's clear, the trial judge didn't rule on this point. It simply found it sufficient to rule on the things that trial judges run across much more often, which is the duty and the proximate cause issue. So why don't we go on to that? And in respect to duty, I would cite to the Pulia versus Builder Square case in terms of outlying. It's an excellent opinion written by Justice Hartman regarding duty and the like in terms of explaining, citing the Ward case and citing the other Supreme Court cases in regarding that it's not only when you talk about the obviousness of something that would be so-called obvious, it's a question of fact. And it's not just the obviousness of it. It's to appreciate the risk. And Pulia talks about that in great detail. And what Pulia says is, in the Pulia case, someone's ring was caught when they were going over to a rack, and they didn't even know if the ring severed the finger or if it was the rack itself, but they had an expert saying it was the rack. And in citing the Deaver case and the Ward case, two Supreme Court cases where summary judgment was reversed, they said that it's open, obvious, it's a question of fact, and it also means not only knowledge of the condition, but also an appreciation of the danger it involves. Obvious means condition and risk are apparent to the reasonable persons. And there's obviously, there's no duty from fire, fall from a height, bodies of water, which causes injuries that are fully appreciated. So let me make sure I understand. What you're, I think what you're saying is that if the danger is there, and there's means to protect against that, well, if the danger is substantial enough, steps should be taken to protect the individual from that danger, even though the danger might be visible, accidents happen, and to protect individuals from injuries that could have been prevented easily. Well, and not only that, Your Honor, but in fact of the degree of risk, as discussed in the Puglia case, and as discussed in the Jackson case, 185 on my second, 418, cited by the defense, they said it can't only be, you know, in this case, it's not the risk of falling from a height, because the risk here from a height is only two or three feet. She's on the first floor of the ground floor, is not a long distance. Now, she could have, from the height, broken her ankle, broken her foot. But here the risk, and it's whether a reasonable person would appreciate the risk, was not a risk from falling from a height a couple feet. Here the risk that Ocean Ansys particularly protects from is respect to getting crushed, as she did between the ascending stair and the mounting platform when she inadvertently stepped into this particular hole. Mr. Power, I don't think you can compare Harris and Humphrey in this case. Now, Humphrey is the company that sent out an employee who, in 1991, was called upon to, what, give an opinion as to the state of the man lift and whether it needed any improvements or corrections or safety measures. Would that accurately describe what that gentleman did, or am I missing something? Well, it did in respect to what he was called out to do was to do an inspection, because they have to do these inspections periodically to make sure they comply with OSHA. Among other things, that's a requirement. So they came out there, and it was the understanding of the Piper people that both Humphrey as well as Harris were doing Ocean Ansys inspections here. And in respect to that one inspection, although 11 years before it was on the third floor rather than on the first floor, because later they moved it. They changed it. They changed it. And, you know, I understand that it was one inspection, and it was 11 years before, and Harris was in here doing inspections, too, within six months of the occurrence. That being said, in respect to the ruling below, you know, there was an expert's affidavit, Mr. Costa. Let me ask you regarding these two entities. Why does Humphrey have any liability if Harris came in after, and Harris didn't correct the wrong that you believe existed that ties in with her injury? I mean, why Humphrey? If Harris saw it most recently, and Harris was pretty much, I think, filled the same shoes as Humphrey, why can you go all the way back to put some liability on Humphrey? Well, if you look at the definition of proximate cause, it doesn't have to be the last or nearest. It's in combination that would cause the injuries we're dealing with. But would you concede that if Humphrey, if Harris had done what it should have done, it would have protected Humphrey as well? Well, and according to the Quaker people, had Humphrey done what they should have done, it would have protected Brenda Mockney as well, too. One of the arguments of your opponents for both Harris and Humphrey is that what these companies did was recommend that there be a guardrail. But there was another, wasn't there a third company that recommended that as well, and that the Quaker company definitively decided not to place the guardrail on the man listed? So I will correct what's going on with all the misnaming here. Industrial Rectors came in in 97, and they, among a quadrillion other things, said that they should put a handrail in that area. They didn't say it violates OSHA. They didn't say it violates ANSI. They didn't tell them, you know, you need to close this man lift down until this is correct. And that's what our experts say should have been done. If you're a safety inspector, you come in, you have an OSHA violation, you have an ANSI violation, and OSHA and ANSI are the same thing, essentially the same thing. Both of them say when you have an, and these are for man lifts. These are, you know, these are rules. This is the law of the land. What OSHA is, that in respect to a man lift, you have to put a guard where the ascending, where the platform and the ascending step would converge to prevent someone from getting pinned between the ascending step and the platform. They foresee exactly what happened here. And Patricia Anderson described this on 6290C, 6293, and 6294, the record, that when she came upon her friend, she was being crushed between the ascending stair and the mounting platform. Well, was there a duty, are you arguing there was a duty with Humphrey and Harris to shut down the man lift? That's what our experts said. Mr. Costin, his affidavit, and in the depositions, they said the same thing, that they should have shut the man lift down until this guard was placed. And that's what OSHA would do. And that's what OSHA did. So the duty was more than simply saying you should have this handrail to comply with OSHA, ASME, is that what it is, A-S-M-E? Yeah. It was more than simply saying, you know, according to these standards, this needs another handrail, but the duty is to say you have to shut this down? And it violates the law. That's what Quaker said. If they had told us, if they had told us that this violates OSHA and ANSI and shut it down, we absolutely would have. It needs to be communicated. Well, what about the company in between, 1997? Industrial Rectors? Yes. They are in the case also. They're not here on appeal. They're not here on appeal, but they also, they also are in the case because they said a handrail, and it's not, you know, it's amongst all the other maintenance or other recommendations. What do you mean by they're in the case? I mean, they were sued. They were sued in the case too. But they're no longer a party. They're in the case. They were in the case. They are not represented because they didn't have insurance, frankly. So they're not here on appeal. But didn't they recommend a handrail as well? Just a handrail. They didn't indicate it was a violation of any statute or OSHA regulation, anything? And they didn't call it a guardrail either. And that's what we're talking about, a guardrail. A handrail is for when you're walking down the stairs. A guardrail is to protect people such as Brenda Mockney to making sure that they don't, as she did inadvertently, end up where she did, between the ascending step and the mounting platform. So that's the duty portion. Then we go to approximate cause? Well, we do the approximate cause, but I just wanted to touch, if I could briefly, on distraction because I think it's a question of fact in terms of the obviousness, especially in terms of the risk in this case. She had no idea that she could, nor would a reasonable person have any idea that they could, by inadvertently stepping into a hole where you have a two- or three-foot drop, you'd end up getting crushed between the ascending step and the mounting platform. She had no idea. That's certainly a question of fact for the jury, whether this is open and obvious. And I think the cases are clear on this point. And for that reason, summary judgment should be reversed. Well, it's not like falling into just a simple hole is what you're saying. Absolutely. Not at all. And it's not like falling down, say, stairs. Stairs from a height, which is what the Jackson case, the Supreme Court differentiated from someone from a fall line. How many feet, then, was this fall where she ended up being crushed? It was a short distance. What is a short distance? Three feet or so. It would not, she asked, and I'm not sure if her feet were on the ground or not, no one testified to it, but when Pam Anderson, her co-worker, found her in 693, 6293, 6294, talked about her, she was at her waist. She was at her waist approximately. She was caught between the ascending step and the mounting platform. So this is a short drop, maybe it's three feet. It's the first floor to the ground floor. And there's stairs that are shortly thereafter. But I just wanted to talk about, briefly, I don't think you know. You don't have a lot of time. To the distraction element. But if you look at, on the distraction element, when we're talking about at C0707, counsel, when he prefaced what was meant by immediately prior, he said, starting at the third floor to the first floor, riding the mangling. That's what he defined as immediately prior. So immediately prior wasn't like as you step in the hole. He defined it at that point. That's what he meant by immediately prior. And then, immediately prior, we're saying that the distraction would apply because she says she's looking ahead at the stairs. And Mr. Berg, our safety expert, talked about that in the record about what distraction is. Our eyes are here. We're looking at the horizon. We don't see below. And that's why we have guards. Does it matter that she said she was aware of this hole, that she passed it many times, that she knew it was there? Does that take this open and obvious issue out of the picture here? No, that makes it worse. And the Simmons case went into that and talked about he had often gone back and forth. Oh, the cart mappers? Cart mappers. But you become used to the situation. And because you pass back and forth, it's a very narrow stairway. It's a question of fact. And certainly, and there's plenty of cases on that where they talk about that issue, that people become lulled to a sense of security, and that's how they inadvertently step there. And I wanted to point out in terms of the photos from the OSHA photos that are in the record, all the other openings were guarded, including the descendant, the descending stair, except this one. Everyone was guarded. That almost lulls you in a sense of security, that it's safe. I'm on the first floor of the ground floor. Every other hole, if you look at the OSHA tapes, we took some stills from that, is guarded except this one. And in terms of the deliberate encounter, I would cite the Morrissey case, which was concurred by Justice Cahill. Morrissey distinguishes that you don't have to be forced like was discussed in the trial judge's order in this case. In this case, she says that she needs to be forced to deliberately encounter the risk, that she had alternatives. The Morrissey case describes that you don't need to be forced to encounter the risk. You can have a reasonable alternative, and I would cite the Morrissey in respect to that case. And in respect now to proximate cause, I would say if you look at both of the briefs in this case, you would never know that she stepped in the hole with her right foot. Not one time in either of the briefs do they say she stepped in the hole with her right foot. Not once. I wouldn't know that except if I looked at the record to see that she did. And even the trial judge's order said she stepped with her right foot. Well, as Justice McBride in the Clifford case, when you reverse, you concurred in that case, where you reversed the trial court, when they talked about Mr. Clifford, didn't he know how he entered the hole? Because he's unconscious. Well, she was rendered unconscious, but she certainly knew she stepped in the right hole, which should have been guarded, and our experts talked about it. There's plenty of cases where experts couldn't even talk about it. She cited a case, and she misread the case. In any event, proximate cause tends to be a question of fact, and if you can get to the point of getting this case before the jury, it would fall hand-in-hand with that. And we have two experts. I do want to – you've cited the record several times, and I see you have a variety of exhibits. Your brief says Judge Lawrence issued – or this case was resolved by Judge Lawrence. Mary Mulhern is on the other. Your white brief says Judge Lawrence. Yes, Jeffrey Lawrence. That's a mistake. All right, all the other briefs say Mary Mulhern. It was Judge Larson on the forum motion, so that's a mistake. All right, you'll get a chance to provide us with an additional argument. Thank you. And there are two appelees. Have you decided how you're going to split your time? Bob Frank with the Harris Defendants. James Braddock. And we've elected to split our time, I believe. Okay. I will go first. All right. Counsel, members of this Court, Justice Garcia, you raised the issue of the comp statute first, and I think that your point was well taken. What the statute says is that there's an immunity, and I quote, for any service organization retained by the employer, and it goes on to state to provide safety service, advice, or recommendations for the employer. Everybody admits that Quaker is the employer. So the question is, how do we interpret any, meaning an expansive term, in service organization? It doesn't say service company. It doesn't say service partnership. It doesn't say inspection company. It says service organization. But why don't we address Mr. Powers' point that if we were to interpret the service organization to mean any company that's hired by the employer to do any safety-related work, we're expanding this protection of the worker comp to so many individuals that are so many entities that there's hardly anything left. So, remember, I focused on two points in the statute in Section 5A of the Comp Act, and I think the second point addresses that, because it says to provide safety service, advice, or recommendations for the employer, and that's the distinction. So what we do is we have- What are they contributing to a warrant giving them this kind of relief or exemption, whatever you want to call it? What have they contributed to get the benefit of the Workers' Compensation Act? Well, Justice McBride, I think there are two things. The one thing we have to look at is what they are actually doing as provided service, which in Myers the court said is something that's in the public good, because by providing this type of safety inspection, it is going to protect workers and hopefully cut down on the incidence of injuries. But the second issue relates to the statute itself. Remember that the statute is not limited to contributing, a service organization contributing to the compensation carrier. But remember, you can't blind yourself to what happens in industry. Whenever a company, particularly a large entity like Quaker Oats, is in the business of buying workers' compensation coverage, it's not like they're buying something off the shelf. There are risk engineers. There are reports that are written. There's an evaluation of the risk. And so by doing this type of service, by putting into the company record this type of service and inspection, they are contributing. It may well be that they're credits that were given for workers' compensation premium. It may well be that it affects what's known as the mod, and you know from your opinions that mod is how companies rate workers' compensation risks. It's not unlike getting a discount for your auto insurance if you have power or assistive brakes or airbags, because that reduces the risk. Yes, sir. If you fill out an application for an automobile, and I think that's a good analog, one of the things they ask is do you have, I forget what kind of brakes are, but you get a reduction for that. Seatbelts, it's the same thing. And here, that's part and parcel of what would happen in industry. If you have a service, if you have, what, scheduled safety inspections, that would be taken into account. It invades every aspect of commerce, whether it's lawyers' malpractice insurance, workers' compensation insurance. But let's go to what the legislature meant by enacting this amendment. Did it mean, well, first let's go back to the original question I had with Mr. Power, that I haven't seen very many cases like this where there's a suit against a safety provider, basically an individual or a company like Harris and like Comfort. Are there many instances like that? Well, there's not, because of the immunity. The immunity is pretty clear. And so one of the things you need to remember is from both the brief of appellant and from Mr. Power's argument, this claim against Harris is not because of maintenance or anything, because we didn't do that. His maintenance against, or his claim against us, is for inspection reports. And that's exactly what the statute addresses. So if we stand in the shoes of the employer and have the same immunity, enjoy the same immunity as the employer, then we have harmony. What the legislature is saying, and remember, what the legislature is doing is they're expanding the Act, because after Nelson, the intent was to expand the Act to include these sorts of protections, because under the Power statute, they didn't exist. So what we have is the legislature. Why does the employer, though, get the protection of the Act in the first instance? Because the employer is charged with protecting its employees. And that's what the Act does. What the Act does is it creates not only a workers' compensation system for the protection of employees, but it creates an incentive for the employer to act safely. Because if he doesn't, then he pays the premium, which gets him to the mod, the inability to compete with other businesses and whatnot. It's all part of the same paradigm. So what we have is the General Assembly that's expanding the immunity, actually creating the immunity as set forth in Myers to do exactly what we have here, to protect service organizations, because simply if you don't do that, then nobody's going to provide the service. Going back to your statement that we don't see very many cases like this, because this provision provides that immunity, I would think we'd still see some cases just as we've seen this case, and yet we're not, we don't have the benefit of cases like this that have gone up to the appellate court and been resolved on that basis of that statute, which would provide us with guidance on this very essential term, service organization, that still leaves some question as to what it really means. Sir, in answering your question, what I'd like to do is to delve into the duty issue a little bit, because I think I can best answer your question by doing so. One of the problems with the argument that's been advanced by the plaintiff in this case is that they're missing a step. They're missing a very important step, and that is that Harris is not the owner or the occupier of land. Now remember, a case that we all read in law school, Paul's Graft vs. Long Island Railroad, involved a guy with a package of explosives, is helped by the conductor, he steps off the train, the package blows up, and people are injured. And the issue was, what is the extent of the duty that's owed? We all read about that in law school. What Justice Cardozo said in that case is that there can't be negligence in the air. There has to be something that ties one to another in creating a tortious linkage, a tortious act. And what he said is you need to have proximate cause, and you need to have a special duty. Now a special duty is principal agent, a special duty is landlord-tenant, a special duty is an owner-occupier or land-to-invitee. There is no such thing as a special duty on the facts that we have here. So one of the things that the plaintiff is missing in this case is he hasn't created or spoken about the special duty. In the Illinois Supreme Court decision at Johnson vs. Condell Hospital, what the court did is it adopted Section 315 and 323 statements to create the special duty. With that background, to get back to your question, where do you have a scenario where a special duty is created in a situation where there are cases in Illinois that deal with elevator maintenance companies? When an elevator maintenance company comes in and actually performs maintenance on an elevator, the courts of Illinois have said that that has created a special duty by virtue of the common carrier analysis, the people that are riding on the elevator, or the escalator, or whatever the contrivance may be. In a situation like this... To that extent, it's because no one else can do the elevator maintenance. No sir, I would disagree, because those companies are charged with it. That's what they do. So by doing it, they're charged with doing it correctly. But contrast that to what we have here. We have a scenario where somebody is in a position of providing nothing more than safety inspections, which has provided an immunity under the statute. And the reason why they don't get sued is because they have the immunity and they don't have the special relationship, the link that the plaintiff is missing here. So you're saying that there's no duty between Harris and the ultimate victim here because there's no connection between them? Under the transfer of negligence doctrine, under Condell, under Brewster, another Illinois Supreme Court decision, there is no connection. There is no special duty, yes sir. Alright. You can wrap up. Well, I know that I've probably spent most of my time, and unfortunately I think I've probably drifted into Mr. Brannett's time. What I would like to do is to conclude with two comments. First of all, on the issue of proximate cause, the only way that you can be held to be breaching the duty of care is if you did something wrong. And you have to have evidence of doing something wrong. And there's no evidence of that here. Let me ask you this question. Between proximate cause and duty, which in your judgment provides the clearest path to a clear answer? Well sir, I think they both do, but I think more clear is duty. There's just no duty on this record. The second thing that I would say is that I believe that in Justice Cahill's recent Rule 23, and it is a Rule 23 decision, and Montenegro of course is familiar with that, I think he got it right. Because when he dealt with the issue, he talked about the owner and occupier. Why are you citing a Rule 23? Other than Justice Cahill being present. It has nothing to do with this case, and the rules do not allow you to cite it for anything. And so I'm cutting you off. But Justice Cahill appreciates the comment anyway. Well you can try, but I'm cutting you off. I'll be cut off. I just want to say that I agree with the logic. But we'll take a look at it later. With that, I respectfully ask that the decision of the trust be reviewed. Good morning, Your Honors. Excuse me. Your name once again? James Brannant. I thought you had some water. I should practice singing before I go. Take your time. You won't be the first to watch this voiceover. I said you're not going to pull out any Rule 23's are you? No, I'm not, Your Honor. I'm not even aware of any right at the moment. Humphrey was involved a long, long time ago. Absolutely. That is one of the huge distinguishing facts that Humphrey has from all the other defendants, including Harris. Not only were we involved 11 years before the accident, when we inspected this man lift, it was an entirely different configuration. It was on the third floor. The mounting platform was on the third floor. It ran from the third to the sixth floor. It was not on the first floor. In 1991, after we inspected it, the evidence demonstrates that it was actually altered. This specific diagram. Mr. Brannant, stop right there. I thought Mr. Power said that had you fulfilled your duty to the plaintiff, the accident wouldn't have happened. Yet that's physically impossible if the man lift ran only from the third floor to the sixth floor and the accident happened on the first floor. Exactly right. He's saying that we not only had a duty to talk about whether it violated the codes, but also that we had to actually physically install a guardrail, which as you point out was physically impossible. It was in a totally different place. It wasn't changed until nine months after we were there. Again, that guardrail, the evidence indicates, was changed. When we were there, Mr. Favreau said there was a guardrail. When Schwarzkopf changed those things... Just so it's clear, the guardrail Mr. Power is referring to is the guardrail that should be at the start of the man lift. On the upside. It would have been on the third floor in this instance and on the first floor subsequently after the accident. Nine months later. So there is some connection. I didn't mean to suggest that there's absolutely no connection. I understand. But even after that, between 1992 and the accident, the entire guardrail system on that man lift on the first floor was removed and replaced. Mr. Schwarzkopf testified that the guardrails that he put on there in 1991 were not the same as they were in 2002. So we have completely different facts, different guardrails on that thing. So there's no connection between us and the accident 11 years later. Not only that, but in between our staying there, we were there for a few hours on one day, 11 years before the accident. After we were there, we were never asked to do anything. Quaker Oats did not ask us to do anything. Did you issue a report? We issued a report, exactly. But we were not asked to do any maintenance. In fact, that's not what we do. We don't do maintenance. We don't do repairs. Well, what did your report suggest? Our report was specifically limited to whether the man lift as it existed on the third floor in 1991 complied with AFSCME only. Contrary to what counsel has told you, we did not agree, and it's undisputed, that we did not undertake to say whether it complied with OSHA or not. Did you say that it complied with AFSCME? It did, yes. Well, we did not say that there was a problem with the guardrails under AFSCME. And Mr. Favreau said that, in fact, the guardrails, at the time that he inspected it, complied with AFSCME. So, first question is, did we have a duty to the plaintiff? And the question is, did our duty extend, not just in 1991, but essentially in perpetuity to 11 years later and beyond? There's no reason, if it extends to 2002, why it shouldn't go beyond that. There's two reasons why it doesn't do that, why there is no such duty. First, this is not only an open and obvious danger, it's a known danger. It's a known danger to Quaker Oats, it's a known danger to Mrs. Maki. She not only knew that this hole existed, she knew that it was not guarded, she knew that she should not step near it, she knew that she should be careful when walking past it, so she wouldn't fall in. The problem I have with that argument is that it places a very heavy burden on the injured party, that the accident would have been prevented if the injured party had simply kept the danger that the open and obvious condition exposed her to. And it would have all been avoided. But let's say there was a vat of acid below and she had fallen into the acid because she tripped and fell, there's some risks that are so severe that should be protected against even if it's open and obvious. I agree with you, Your Honor, but the question is who has that duty? In this case, the duty that they've alleged against us is the duty to inform Quaker Oats that that opening was unguarded and dangerous. They did not say we had a duty to install the guard. In fact, that's not what we do. Quaker Oats itself had exclusive control over whether that guard was going to be put in. And they had the duty to install a guard. The only question is whether we had a duty to warn them of a risk that they already knew of. And the law is that we don't have a duty to warn them of a risk because that's a pointless act. There was information in the record about Quaker doing routine safety discussions with employees. Is that correct? Correct. Did that include information that the danger of this hole was the possibility of someone being crushed like she was? Yeah, absolutely. That's what they trained her about and all the employees is that they had to be careful when they went past this opening because they could have serious injury if they fell into it. Not just that they would fall 3 feet, but that they could be seriously injured because of the mechanism itself. And that's exactly what happened. A seriously dangerous mechanism didn't have a guardrail to prevent what would be an obvious danger. I guess. It didn't have a guardrail and there was obviously a reason Quaker Oats chose not to install that. Because they were told over the years, as you pointed out, that they should install such a guardrail. And they chose not to do it. The other thing I need to point out is that there's an entirely different record applicable to Humphrey than there is to Harris. For example, counsel for the plaintiff has argued about Mr. Berg, their expert Berg. His testimony was not presented on our motion for summary judgment. Also, their other expert, Custa was not, only had his affidavit presented. And that goes to the question of breach of duty. Now, our person, Favreau, said that we complied with AFSCME. Plaintiff did not present any evidence that, well, he tried to present the affidavit of Custa. And the trial court declined to consider it because she said it was conclusory and speculative. And if you look at the affidavit itself, that is absolutely true. All he did is he said that the guardrail, as it existed in 2002, violated AFSCME and OSHA. He didn't say why. He didn't say what provision of OSHA or AFSCME it violated. He didn't say, excuse me, what was necessary. He didn't specify that. And that was it. So that's, I don't know what any judge or any fact finder could do with that. So that's not enough. They've argued while we presented... They also said that we presented on our reply brief the deposition of their expert. That's not true. We only presented four pages of that to further support our position that it was speculative. Their motion to reconsider would state that there's no argument on their part that the trial court erred in denying their motion to reconsider. So in the motion to reconsider, the judge declined to consider his deposition also. But even if you were to look at that, what Custa said is that you don't have to have a guard on there all the time. You only have to have a guard on there when you're going to prohibit side mounting. And he merely assumed that Quaker Oats barred side mounting. He had no evidence to support that. And that's the problem. That is the reason why they didn't put a guard on there is that so that people could quickly get on and move on. So they failed to establish duty, breach of duty, approximate clause. I rest on our brief on that. We also joined in the Workers' Comp Act argument. We didn't present it in the trial court in all candor. So isn't it waived? No, Your Honor. If it's supported by the record on appeal, you can affirm on that basis. It would be a pointless gesture to send us back if you're going to establish the law in our favor to send us back just to file another motion. Thank you. In respect to training, Brenda Mockbee was trained to get off and on the man lift, basically. And that's what she testified to. And the training would have been by Quaker? By Quaker, yeah. On C0711 and C0723. So 07023 and 07011. She said that's basically what she was trained. To get off and on mounting. Mr. Power, Humphrey indicates that when they came out there, they examined the third floor. True? That absolutely is correct. And it was foreseeable, because it's in their notes, that they were going to expand the man lift. But the first floor was not in place when they came out in 1991. That is true. How could they become responsible for giving an opinion about the third floor when the first floor was not in existence at that time? Well, because Mr. Schwarzkopf testified under oath that what he did, and he looked at the guardrail system as set up on the day of the occurrence, he was shown photographs, and he said he took that exact guardrailing system and took it from the third floor and put it on the first floor. As is. And from 1977 up until 1991-92 he testified when the transfer was made there was no guardrail at the ascending stair. That's what he testified to. Mr. Farlow testified that he believed, based on his notes, because he had no memory of this occurrence, that he thought there was a guardrail where this occurrence took place. He thought that. He wasn't sure when he put in his notes guardrail on platform near ascending stair he wasn't sure if it meant either stairs where she was going to go down or this place, but he thought that. Now Mr. Schwarzkopf testified to the contrary and the trial judge had both in front of her and she chose to believe Mr. Farlow. But shouldn't she be doing that? That's what you're saying. She shouldn't be doing that. That's my question. Because in her order she disregarded our expert's testimony because he said assuming the guardrail in 2002 was like that back at the time Humphrey did their inspection then they were negative. Now he wasn't making a judgment, Farlow versus Schwarzkopf. He was saying assuming this is because as we know when you have testimony that two people disagree he's not going to accept Schwarzkopf because he's testifying favorable to us he's saying assuming. Wasn't there really only one person then who was accurately testifying to the condition in 1991? If he's assuming something but there's evidence in the record that completely dispels that fact. Well and there's evidence that supports that fact and that's why this is typically a jury question as to what the jury believes. And the jury may well feel that because of the time factor and because of the fact that it was moved from the 3rd to the 1st floor But the conflict in the expert affidavits really doesn't play a big role in the decision regarding Humphrey. It really didn't because what she said is she disregarded the expert they didn't move to strike the expert's affidavit. They accepted that. The judge when she issued her order said he didn't look at Favreau's testimony because Favreau said he thought there was a guardrail there. So that's what she said and I think she was wrong because if she looked at Schwarzkopf's testimony Schwarzkopf's testimony was different. I'm saying that she granted summary judgment for reasons primarily other than the interpretation that you're taking that she chose one expert over the other. Well not according to her order. In her order she said that Costa said what he said but he didn't look he mustn't have really considered Favreau's testimony where he did. And the exhibit they attached to their response to summary judgment showed the depositions that he had reviewed. It includes Schwarzkopf and Favreau. And he did. He had considered both. Let me ask you just one final question for my purpose. It's the only question I have and that is your primary reason for distinguishing 5A with respect to these two defendants. What is it? 5A. Under the workers' comp. Well there is none because neither of them are service corporations. So I don't think it would apply. They're not service corporations as you interpret the term service organization under the act. In fact you interpret the service organization to only apply to the worker coverage insurance. Like in the Meyer case. What we have in Meyer. And when counsel says it's their burden of proof on that. Any other inspector is not covered. I don't think any inspector other than someone who's working for some corporation affiliated with the workers' comp carrier. And when counsel says well assume they're getting a benefit for example of reduction for workers' compensation. No we don't know that. It's not in the record. What other reason would they have for hiring somebody like that? They're obligated to do it under the OSHA standards. They're obligated to have inspections every 30 days. And OSHA's there to what? Protect the employees. And the same policy is present in the worker comp statute. Well no I'm just talking about for OSHA's purposes. I don't know that they get a benefit for a reduction in insurance premiums or anything else. Well we don't either. They wouldn't do it just for the... But the policy's there. I mean it's consistent with the policy of protecting employees. Absolutely. That's what they should have done here. And they did it negligently. And as I said if this... Humphrey didn't even... This is the first time this has ever come up. So obviously it's been around a long time. If this was something that was really anybody thought their interpretation was correct I'm sure as I said there'd be hundreds and thousands of cases involving this. Because you're granting immunity to everyone including in this building. Anyone that would come in and do an inspection. And if the building blows up, well somehow they would say that some company that does service and maintenance and repair that they're immune. No just service. They don't, but for the service part of it. But they're really not just that type of organization. They do it all. This is not purely a service company that we're dealing with in either Harris or Humphrey. Either of them are service... But were they contracted in this particular case to do anything other than perform an inspection? Well they weren't. They could have been hired. They could have sold parts. They could have. But they weren't. They weren't hired to do it. They were hired specifically to do a safety inspection. Well and make recommendations and then they would do bids if they decided they were going to bid it out or do it in house. That would be up to Quaker to decide. But to suggest that they're going to be immune anybody who does... Not just for the inspection part. Well that would be quite... And an inspection itself really can't create a dangerous condition. It could only... not write the right report to fix a dangerous condition. Which is why you're hiring them. I thought it goes to Justice Cahill's point that... They're simply hired to inspect your facility to determine whether or not something needs to be done in order to bring it in compliance with the law. Well the law... Among other things. But if that's all they do, why shouldn't they be entitled to the immunity that's provided by the... Well they weren't doing this just to see if it complied with the law. They were doing a general safety inspection that not only would see if there was compliance with the law, but maybe there were worn out parts that didn't have anything to do with OSHA. But this particular part had to do with OSHA and ANSI. But they were doing other things that maybe they had and they did. They would say that something's worn out. The lift is worn out. So it's a number of other things and some of them may not have anything to do with safety. Part of their inspection included safety. But I thought it's important when the counsel said they had no special duty and they cited a case, something versus Condell Hospital. I looked at their brief. There is nothing about this case versus Condell Hospital. In fact, in looking at their brief, they talk about... And we agreed that anybody who does an activity for the benefit of the possessor of land has the same duty and freedom from that duty. And that's why what we've been arguing about to this point. It had to do whether or not this was open and obvious, which is something that is a defense of a landowner. Well, I'm still back on the duty issue, not on the open and obvious issue. Yeah, but the duty issue, we all agreed. And they cited, they in fact cited the restatement 343, Randage. Randage case 346, 103, 116. It's in their brief on page 10. That's not their first line of defense. Their first line of defense, which is why they have the workman's compact. I'm just saying when they said they had no duty here, no special duty under common law, if you look at their brief, that has never been raised before. The case they cited, the Condell Memorial Hospital case, had not been cited. So these cases they're citing were not in their brief. I thought we all agreed that they had the same duty as a possessor of land when they performed activity for the benefit of the possessor. So that's a new argument they've raised for the first time. We'll consider that. Thank you. I would ask that you reverse the trial judge as to both defendants. Thank you. The case will be taken under advisement.